UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
: 
GLEN CRAIG, : No. 1:24-cv-10048
:
        *Plaintiff*, : **COMPLAINT FOR COPYRIGHT**
: **INFRINGEMENT**
v. :
:
NETWORK ENTERTAINMENT INC., :
FREMANTLE LIMITED, MGMPLUS :
ENTERTAINMENT LLC, THE NEW YORK :
TIMES COMPANY, and APPLE INC., :
:
        *Defendants*. : *JURY TRIAL DEMANDED*
:
------------------------------------- x

    Plaintiff Glen Craig, for his Complaint against Defendants Network Entertainment Inc., Fremantle Limited, MGMPlus Entertainment LLC, The New York Times Company, and Apple Inc., alleges as follows:

## JURISDICTION

    1.    This action arises under the Copyright Act of 1976, Title 17 U.S.C. § 101 et seq. This Court therefore has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question) and § 1338 (copyright).

## SUMMARY OF ALLEGATIONS

    2.    Singer, songwriter, and musical artist Iggy Pop is a legend in music. Sometimes called the Godfather of Punk, Pop has been writing and performing music since the mid-1960s. Lasting for over 50 years and still going strong, Pop's career and his body of work have landed

1

him in the Rock and Roll Hall of Fame—as a member of the proto-punk band The Stooges—and earned him a Grammy Lifetime Achievement Award for his solo work.

3. In 1967, Pop formed The Stooges with guitarist Ron Asheton, drummer Scott Asheton, and bassist Dave Alexander. Over the next few years, the band released two albums: *The Stooges* in 1969, and *Fun House* in 1970. It was during this time that Plaintiff—in the early years of what would become a long career as a world-renown music photographer—captured many iconic images of Pop, the band, and their performances. Some of these photographs have remained unpublished for almost 50 years and had never been seen by the public.

4. In 2018, Defendant Network Entertainment approached Plaintiff about licensing some of his photographs of Pop and the Stooges for use in a production named *Punk*, a docuseries with Iggy Pop himself attached as an executive producer.

5. Plaintiff authorized Network to use nine photographs of Iggy Pop and his band in the *Punk* series. He separately licensed two of the photographs for use in a *New York Times* article, and one photograph for a business-to-business brochure. Each of the licenses contained restrictions on the permissible scope of Defendants' use—most importantly, limiting and even prohibiting promotional use and widespread publication of the photographs.

6. Defendants exceeded the scope of the licenses—among other things, using one photograph as key art in *Punk* promotional material and providing it to media outlets and distribution partners across the world. As a result of Defendants' infringing actions, some of the photographs—the distribution of which Plaintiff had tightly controlled for five decades—have been widely disseminated and appear extensively across the web in banner ads promoting the

series, in digital news articles of numerous foreign publications, and as the thumbnail image advertising the *Punk* series on media platforms across the world.

7. This rampant infringement has ruined the value in the photographs, compelling Plaintiff to bring these claims.

**PARTIES**

*Plaintiff Glen Craig*

8. Plaintiff Glen Craig is a photographer. At the age of just 15, a chance opportunity led to a photo shoot with B.B. King in 1965, with one of the photos covering an issue of *Cashbox* magazine. The breakthrough set the stage for a long career in music photography. By the age of 16, Plaintiff's images of musicians were being published in magazines across the world.

9. Over his long career, Craig has photographed many musicians who were or went on to become legends in music, including celebrated musical artists Aretha Franklin, James Brown, Gene Vincent, Jerry Lee Lewis, Little Richard, Chuck Berry, Wayne Cochran, and Johnny Cash, as well as rock and roll icons The Beatles, The Rolling Stones, The Who, Jimi Hendrix, Eric Clapton, The Beach Boys, Loving Spoonful, The Doors, and countless others.

10. With a career spanning over 50 years, Plaintiff has become one of the world's preeminent and well-renown music photographers. His images have appeared in a wide-variety of U.S. and international newspapers, magazines, and other media outlets, including *The New York Times*, *Wall Street Journal*, *Paris Match*, *Rolling Stone*, *Vogue*, *Esquire*, *GQ*, *Entertainment Weekly*, *Billboard*, *Time-Life*, Neflix and HBO. His work has also appeared on music labels, corporate campaigns, and advertisements.

11. Craig resides in Astoria, a neighborhood in the borough of Queens, New York.

*Defendants*

12. Defendant Network Entertainment Inc. ("Network") is a corporation incorporated in and registered under the laws of the province of British Columbia, Canada, with a principal place of business in Vancouver, British Columbia.

13. Network is a film and television production company that creates, finances, produces, and delivers programming to television, digital platforms, and movie theaters throughout the world.

14. On information and belief, directly or through a wholly owned subsidiary, Network was responsible for the production of the *Punk* docuseries, including the licensing of intellectual property, such as Plaintiff's photographs, for use in the production.

15. Defendant Fremantle Limited is a private limited company organized in and registered under the laws of the United Kingdom, with a principal place of business in London, England.

16. Fremantle is a multinational television production and distribution company that creates, produces, and globally distributes audiovisual content, including films and documentaries.

17. On information and belief, Fremantle is responsible for the distribution of the *Punk* docuseries, including the creation and dissemination of promotional material.

18. Defendant MGMPlus Entertainment LLC is a limited liability company organized in and registered under the laws of the State of Delaware, with a principal place of business in New York, New York.

19.　　On information and belief, MGMPlus is a content provider that delivers programming to users and subscribers through cable, satellite, and digital streaming platforms. MGMPlus owns and operates MGM+, a premium cable and satellite network and over-the-top streaming platform previously known as ePix.

20.　　Before 2023, MGMPlus was known as Epix Entertainment LLC ("Epix").

21.　　Defendant The New York Times Company ("the NYT Company") is a corporation organized in and registered under the laws of the State of New York, with a principal place of business in New York, New York.

22.　　The NYT Company is a mass-media company that publishes daily digital and print editions of the newspaper *The New York Times*, its associated publications, and other media properties.

23.　　Defendant Apple Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business in Cupertino, California.

24.　　Apple is a multinational technology company that designs, develops, and sells consumer electronics—including computers, wearables, and home accessories—software, and a wide range of online services, including digital content services like Apple Books, Apple Music, Apple News, and Apple TV. Until January 2024, Apple had been the world's largest company based on market capitalization.

25.　　Among Apple's offerings is Apple TV+, a premium subscription over-the-top streaming service. On information and belief, Fremantle licensed the *Punk* docuseries to Apple for streaming in the United States and Canada on the Apple TV+ platform, where it is still available today.

5

### *Personal Jurisdiction and Venue*

26. This Court has personal jurisdiction over Network under the federal long-arm statute, Fed. R. Civ. Proc. 4(k)(2), because there is no other forum that can exercise personal jurisdiction over it, and Network has sufficient contacts with the United States, as a whole, to comport with due process.

27. Network's contacts with the United States include, among other things: (a) business relationships with individuals and businesses in the entertainment industry related to film and television projects, (b) a corporate and, on information and belief, operational connection to at least one U.S. affiliate, Network Entertainment, Inc., a Nevada corporation, (c) accounts on social media networks *X*, Instagram, and LinkedIn, all of which are U.S.-based companies and instrumentalities headquartered and functioning in the United States.

28. These contacts are the result of deliberate and intentional conduct, purposely directed toward the United States, on the part of Network.

29. Plaintiff's claims against Network arise from its contacts with the United States, specifically at least its contractual relationship with Plaintiff as a licensor of Plaintiff's intellectual property for the *Punk* docuseries.

30. Given these extensive and purposeful contacts with the United States, exercising personal jurisdiction over Network would be reasonable and consistent with due process.

31. This Court has personal jurisdiction over Fremantle under the federal long-arm statute, Fed. R. Civ. Proc. 4(k)(2), because there is no other forum that can exercise personal jurisdiction over it, and Fremantle has sufficient contacts with the United States, as a whole, to comport with due process.

32. Fremantle's contacts with the United States include: (a) business relationships with individuals and businesses in the entertainment industry related to film and television projects, (b) a corporate and, on information and belief, operational connection to at least one U.S. affiliate, FremantleMedia North America, Inc., a Delaware corporation with a principal place of business in California, (c) accounts on social media networks *X*, Instagram, and LinkedIn, all of which are U.S.-based companies and instrumentalities headquartered and functioning in the United States.

33. These contacts are the result of deliberate and intentional conduct, purposely directed toward the United States, on the part of Fremantle.

34. Plaintiff's claims against Fremantle arise from its contacts with the United States, including without limitation numerous business relationships related to the distribution and promotion of the *Punk* docuseries.

35. Given these extensive and purposeful contacts with the United States, exercising personal jurisdiction over Fremantle would be reasonable and consistent with due process.

36. This Court has personal jurisdiction over MGMPlus because it has a principal place of business in the State of New York and this judicial district, making its contacts with this State "so continuous and systematic" as to render it "at home" here.

37. This Court has personal jurisdiction over the NYT Company because it is registered under the laws of the State of New York, making its contacts with this State "so continuous and systematic" as to render it "at home" here.

38. This Court has personal jurisdiction over Apple because, on information and belief, the unit responsible for the infringing instrumentality, Apple TV+, is headquartered at the

Kaufman Astoria Studios in Astoria, New York. Apple's contacts with this State are therefore "so continuous and systematic" as to render it "at home" here.

39. Alternatively, this Court has personal jurisdiction over Apple under New York's long-arm statute because it has sufficient contacts with the state such that the exercise of jurisdiction would be reasonable, and the claims in this action arise out of those contacts.

40. Apple's contacts with New York include business relationships with individuals and businesses in the state related to film, television, and other media projects, as well as significant operations—dozens of Apple stores across the state and the headquarters of Apple TV+—and large numbers of employees and executives in the state.

41. These contacts are the result of deliberate and intentional conduct, purposely directed toward New York, on the part of Apple.

42. Plaintiff's claims against Apple arise from its contacts with New York, including without limitation the headquarters of Apple TV+, the infringing instrumentality.

43. Given these extensive and purposeful contacts with New York, exercising personal jurisdiction over Apple would be reasonable and consistent with due process.

44. Venue in this judicial district is proper under 28 U.S.C. § 1400(a).

## BACKGROUND FACTS

### *Plaintiff's Photographs and the* Punk *Docuseries*

45. In December 2018, Epix announced that it had greenlighted a docuseries about the origins, birth, and legacy of punk rock and the punk subculture. Known as *Punk*, the docuseries had John Varvatos and Iggy Pop attached as executive producers and Network as the production company. Epix ordered four episodes.

46. Network executives approached Plaintiff about using some of his iconic music photographs of Iggy Pop and his band The Stooges for the docuseries. Ultimately, they agreed on nine photographs for use in the *Punk* production.

47. Among the photographs chosen for the docuseries was an image of a shirtless Iggy Pop singing into a microphone ("Shirtless Iggy"). This image appears below:



48. Another photograph chosen for the docuseries was an image of Iggy Pop in studio ("Studio Iggy"). This image appears below:



49. Another photo chosen for the docuseries was an image of Iggy Pop in a crowd at a music venue ("Crowd Iggy"). This image appears below:



50. Plaintiff is the owner of and holds the copyright in the Shirtless Iggy, Studio Iggy, and Crowd Iggy photographs. Each of the infringed photographs is registered with the United States Copyright Office as part of Registration No. VAu 1-205-736 (eff. Feb. 2, 2015) and Registration No. VAu 1-265-352 (eff. Dec. 31, 2015).

51. In exchange for a fee, Plaintiff licensed the nine photographs—including the Shirtless Iggy, Studio Iggy, and Crowd Iggy photographs—to Network for use in the *Punk* docuseries. But the scope of the license included important limitations: the images could be used in the *Punk* audiovisual work only and not any promotional material or advertising, except as part of *Punk* footage contained in a trailer video.

52. After the release of the first episode of the *Punk* series in March 2019, Plaintiff granted two more limited licenses, each for an additional fee, for some of his photographs of Iggy Pop and the Stooges.

53.  Specifically, in mid-March 2019, Plaintiff licensed the Studio Iggy photograph and the Crowd Iggy photograph to Epix and the NYT Company for use in a *New York Times* article about the *Punk* series. The license was limited in scope: the images could be used a single time in an English-only print and digital edition of the newspaper only. The license did not include permission to use the images in web banners or advertising, nor in any affiliated publications, such as foreign-language editions of the newspaper.

54.  Also in mid-March 2019, Plaintiff licensed the Shirtless Iggy photograph to Network for Fremantle's use to market the *Punk* docuseries to international distributors. The license was limited in scope: the image could be used only in a business-to-business brochure to market the docuseries at the MIPTV and MICOM trade shows. The license therefore did not include permission to use the image on public-facing promotional material.

### *Defendants' Infringements*

55.  Defendants infringed Plaintiff's copyright in the Shirtless Iggy photograph, the Studio Iggy photograph, and the Crowd Iggy photograph (together, the "Infringed Images") by using them outside the scope of the licenses.

56.  Specifically, Network provided the Infringed Images to Fremantle without restriction, thus facilitating unauthorized uses by Fremantle and many others. Without authorization, Fremantle used the Shirtless Iggy photograph as key art in material promoting the *Punk* docuseries, making it the primary visual artwork used and repeated across all territories and all media, including posters, print, television, and digital advertisements, streaming and downloading thumbnails, and the like.

57. As a result of Fremantle selecting it as key art, digital copies of the Shirtless Iggy photograph have proliferated across the internet, appearing as the thumbnail or avatar for digital versions of the docuseries across the world, in multiple countries and languages, as well as digital news articles about the docuseries and as banner ads and other digital promotions of the docuseries. These unauthorized uses include Apple TV+ (in the United States, Canada, and France), SkyTV in Italy, *Artribune* Italy, Doqu TV Europe, international versions of *Rolling Stone*, and Sky Link TV in China, among others, as well as in foreign-language news articles promoting the docuseries and on social media posts across the world.

58. Given its widespread distribution, the rampant unauthorized use of the Shirtless Iggy photograph has virtually destroyed the remaining licensing value it had. Because of the image's quality, visual appeal, and subject matter—and, before Defendants' actions, its limited distribution—Plaintiff stood to earn significant revenue from ongoing licensing of the Shirtless Iggy photograph. That revenue stream is now diminished because of Defendants' actions.

59. Plaintiff never intended to license the Shirtless Iggy photograph to Defendants for the full scope and extent of Defendants' actual use. Given the effect that such widespread distribution would have (and will have) on the licensing value of the image, had the license included the full scope and extent of Defendants' actual use, Plaintiff would have charged a significant fee.

60. In addition, without authorization, the NYT Company published the Studio Iggy and Crowd Iggy photographs in at least one affiliated publication, a Spanish-language version of *The New York Times*, in violation of the scope of the license for a single, English-only use. Plaintiff was not compensated for this unauthorized use, or any others that may have occurred.

61. Each of the Defendants operates in an industry in which copyrights are prevalent and well-understood. Based on that knowledge, each of the Defendants was aware of the importance of copyright protection and knew that it needed to scrupulously adhere to scope limitations on any copyright license. Each of the Defendants acted recklessly in failing to do so.

## CLAIM ONE

### Copyright Infringement – Against All Defendants

62. All prior paragraphs are incorporated into this claim.

63. Plaintiff is the copyright owner of the Infringed Images named in this Complaint.

64. Each of the Defendants have reproduced, displayed, or otherwise copied the Infringed Images without Plaintiff's authorization or license.

65. The foregoing acts of Defendants infringed upon the exclusive rights granted to copyright owners under 17 U.S.C. § 106 to display, reproduce, create derivative works, and distribute its work to the public. Such actions and conduct constitute copyright infringement in violation of 17 U.S.C. §§ 501 et seq.

66. Plaintiff has complied in all respects with 17 U.S.C §§ 101 et seq. and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced works in accordance with 17 U.S.C § 408.

67. Plaintiff has suffered damages as a result of Defendants' unauthorized use of the Infringed Images.

68. Having timely registered copyright in the Infringed Images, Plaintiff is entitled to elect statutory damages under 17 U.S.C. § 412 and § 504(c), in an amount of not less than $750 or more than $30,000 per infringement of each work registered before the infringements.

69. Plaintiff alleges, on information and belief, that Defendants' actions were intentional or in reckless disregard of Plaintiff's copyrights, and that such actions support an award of enhanced statutory damages for willful infringement under the Copyright Act, 17 U.S.C. § 504(c)(2), in the sum of up to $150,000 per infringed work.

70. In the alternative, Plaintiff is entitled to recovery of his actual damages and Defendants' profits attributable to the infringement of the Infringed Images, under 17 U.S.C. § 504(b).

71. Within the time permitted by law, Plaintiff will make his election between actual damages and profit disgorgement, or statutory damages.

72. Plaintiff is also entitled to an award of attorney fees and other expenses under 17 U.S.C. § 412 and § 505.

## CLAIM TWO

**Contributory Copyright Infringement – Against Network and MGMPlus**

73. All prior paragraphs are incorporated into this claim.

74. If Network and MGMPlus are not liable as direct infringers of the Infringed Images, they are secondarily liable for the infringements directly committed by Fremantle, the NYT Company, Apple, and numerous other domestic and foreign infringers (the "Direct Infringers").

75. Network contributed to, induced, or assisted infringements by Fremantle, and downstream infringers of Fremantle, by providing Fremantle the Shirtless Iggy photograph without restrictions on its use. Network had, or should have had, knowledge of the infringements of Fremantle and its buyers. Further, as the production company with responsibility for the *Punk*

docuseries, Network had the right and ability to supervise the infringing activity of Fremantle and its buyers as part of its role as producer of the project.

76. Network also obtained some financial benefit from the infringement by Fremantle because the Shirtless Iggy photograph was the key visual art used to distribute the docuseries to buyers and for those buyers to draw viewers of the work. Accordingly, Network had an incentive to permit and even encourage infringement by Fremantle.

77. In addition, MGMPlus contributed to, induced, or assisted infringements by the NYT Company by providing it with the Studio Iggy and Crowd Iggy photographs without restrictions on its use. MGMPlus had, or should have had, knowledge of the infringements of the NYT Company. Further, as the entity with responsibility for the promotion of the *Punk* docuseries on its digital platform ePix, MGMPlus had the right and ability to supervise the infringing activity of the NYT Company.

78. MGMPlus also obtained some financial benefit from the NYT Company's infringement because the Studio Iggy and Crowd Iggy photographs were used in a newspaper article intended to draw viewers to the *Punk* docuseries on ePix and other platforms. Accordingly, MGMPlus had an incentive to permit and even encourage infringement by the NYT Company.

79. As a direct and proximate result of said acts of secondary infringement, Plaintiff has suffered damages in an amount to be proven at trial.

80. Plaintiff is entitled to actual damages and disgorgement of profits realized by Network and MGMPlus in an amount to be proven at trial or, at its election, statutory damages.

81. Within the time permitted by law, Plaintiff will make his election between actual damages and profit disgorgement, or statutory damages.

82. Plaintiff is also entitled to an award of attorney fees and other expenses under 17 U.S.C. § 412 and § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. For a preliminary and permanent injunction against Defendant and anyone working in concert with them from further copying or displaying the Infringed Images;

B. For an order requiring Defendants to account to Plaintiff for their profits and any damages sustained by Plaintiff arising from the acts of infringement;

C. As permitted under 17 U.S.C. § 503, for impoundment of all copies of the Infringed Images used in violation of Plaintiff's copyrights—including digital copies or any other means by which they could be used again by Defendants without Plaintiff's authorization—as well as all related records and documents;

D. For actual damages and all profits derived from the unauthorized use of the Infringed Images or, where applicable and at Plaintiff's election, statutory damages;

E. For an award of pre-judgment interest as allowed by law;

F. For reasonable attorney fees, court costs, and all other costs and expenses authorized or permitted under law;

H. For such other and further relief as the Court deems just and proper.

///

///

## JURY DEMAND

Plaintiff demands trial by jury of all issues permitted by law.

Dated: December 31, 2024                  PERKOWSKI LEGAL, PC

                                                                 By:   /s/ Peter Perkowski
                                                                  Peter E. Perkowski (Bar Id #5934765)
515 S. Figueroa Street, Suite 1800
Los Angeles, CA 90071
Tel: (213) 340-5796
peter@perkowskilegal.com

*Counsel for Plaintiff GLEN CRAIG*